**PENNSYLVANIA ENVIRONMENTAL DEFENSE FOUNDATION,**
Petitioner

v.

**COMMONWEALTH of Pennsylvania, and Governor of Pennsylvania, Thomas W. Corbett, Jr., in his official Capacity as Governor, Respondents.**

Commonwealth Court of Pennsylvania.

Argued Oct. 8, 2014.

Decided Jan. 7, 2015.

Reargument Denied Feb. 3, 2015.

John E. Childe, Jr., Camp Hill, for petitioner.

Sean M. Concannon, Deputy General Counsel, Harrisburg, for respondent Thomas W. Corbett, Jr.

Howard G. Hopkirk, Senior Deputy Attorney General, Harrisburg, for respondent Commonwealth of Pennsylvania.

BEFORE: DAN PELLEGRINI, President Judge, and BERNARD L. McGINLEY, Judge, and BONNIE BRIGANCE LEADBETTER, Judge, and RENÉE COHN JUBELIRER, Judge, and MARY HANNAH LEAVITT, Judge, and P. KEVIN BROBSON, Judge, and ANNE E. COVEY, Judge.

OPINION BY Judge BROBSON.

## I. INTRODUCTION

Before the Court for disposition are cross-applications for summary relief in this original jurisdiction matter. Petitioner Pennsylvania Environmental Defense Foundation (PEDF) seeks relief under the Declaratory Judgments Act[1] with respect to (a) the past and future leasing of State land for oil and natural gas development and (b) the use of monies in the Oil and Gas Lease Fund. Respondents are the Commonwealth of Pennsylvania and its Governor, in his official capacity (Commonwealth Respondents).

## II. BACKGROUND

This lawsuit, originally filed on March 19, 2012, relates to actions by the legislative and executive branches of the Commonwealth to address lean budget years through revenue generated from the leasing of State lands to private parties for natural gas development. Though the leasing of State lands for oil and gas development is not a recent practice, the demand by private parties to access natural gas reserves under State lands has increased exponentially in recent years due to improved technologies for extraction of natural gas in what has been known for more than seventy-five years as the Marcellus Shale Formation.[2]

### A. DCNR

In 1995, through passage of the Conservation and Natural Resources Act (CNRA),[3] the Department of Environmental Resources (DER) was renamed the Department of Environmental Protection (DEP) and a new agency, DCNR, was born. According to the legislative findings in the CNRA, the General Assembly believed that the structure of the former DER did not allow enough attention, financial and otherwise, to be afforded to the protection of our State forest and park lands, warranting the creation of a new cabinet-level agency to advocate for those interests. Section 101(a) of the CNRA. In those same findings, the General Assembly expressly recognized Article I, Section 27 of the Pennsylvania Constitution, also known as the Environmental Rights Amendment: "Pennsylvania's public natural resources are to be conserved and maintained for the use and benefit of all its citizens as guaranteed by section 27 of Article I of the Constitution of Pennsylvania." *Id.*

1.  42 Pa.C.S. §§ 7531–7541.

2.  The process of leasing State lands begins with written, confidential nominations of specific tracts of land for leasing from the oil and gas industry. The Department of Conservation and Natural Resources (DCNR), through its Bureau of Forestry, reviews the nominations and chooses when and if to offer the nominated tracts for lease through competitive bidding. Prelim. Inj. Hr'g Ex. R–5 at 1 (Aug. 2008 Oil and Gas Lease Sale State Forest Environmental Review).

3.  Act of June 28, 1995, P.L. 89, 71 P.S. §§ 1340.101–.1103.

The primary mission of DCNR, as set forth in the authorizing legislation, is as follows:

> The primary mission of [DCNR] will be to maintain, improve and preserve State parks, to manage State forest lands to assure their long-term health, sustainability and economic use, to provide information on Pennsylvania's ecological and geological resources and to administer grant and technical assistance programs that will benefit rivers conservation, trails and greenways, local recreation, regional heritage conservation and environmental education programs across Pennsylvania.

Section 101(b)(1) of the CNRA. Among the powers conferred on DCNR is the authority

> to make and execute contracts or leases in the name of the Commonwealth for the mining or removal of any *valuable minerals* that may be found in State forests ... whenever it shall appear to the satisfaction of the department that it would be for the best interests of this Commonwealth to make such disposition of those minerals.

Section 302(a)(6) of the CNRA (emphasis added).[4]

### B. The Lease Fund

Under a 1955 law known as the Oil and Gas Lease Fund Act (Lease Fund Act),[5] all "rents and royalties" from gas leases on Commonwealth land are to be deposited into a fund called the Oil and Gas Lease Fund (Lease Fund). The Lease Fund is to be "exclusively used for conservation, recreation, dams, or flood control or to match any Federal grants which may be made for any of the aforementioned purposes." Section 1 of the Lease Fund Act. The Lease Fund Act places the determination of "the need for and the location of any project authorized" by the Lease Fund Act within the discretion of DCNR. Section 2 of the Lease Fund Act. The Lease Fund Act expressly appropriates "[a]ll the moneys from time to time paid into" the Lease Fund to DCNR to carry out the purposes of the Lease Fund Act. Section 3 of the Lease Fund Act.

According to the testimony of Dr. James Grace (Dr. Grace),[6] who served in various leadership capacities within DCNR and DER from 1987 through 2010, DCNR (and its predecessor the Department of Forests and Waters within DER) has continuously leased State land for natural gas extraction since 1947. Prior to 2008, total revenue from those leasing activities to the Commonwealth was approximately $150 million dollars.

### C. The 2008 Lease Sale

In 2008,[7] DCNR conducted its first lease sale of State land for natural gas development during the Marcellus Shale era (2008 Lease Sale).[8] In all, DCNR leased 17

---

**4.** Because no party has argued otherwise, the Court will assume for purposes of ruling on the pending applications that "valuable minerals" under the section include natural gas.

**5.** Act of December 15, 1955, P.L. 865, 71 P.S. §§ 1331–1333.

**6.** Prelim. Inj. Hr'g, Notes of Testimony (N.T.) 13–14, 23–30 (May 28, 2014).

**7.** The parties refer to this first round of Marcellus Shale leasing as the 2008 leases. This

date appears to correspond with the date that DCNR conducted the "lease sale"—*i.e.*, August 2008—not necessarily the date on which DCNR executed the leases. Prelim. Inj. Hr'g Exs. R–5 (Aug. 2008 Oil and Gas Lease Sale State Forest Environmental Review), R–1 (Oil and Gas Lease for State Forest Lands, Contract No. M–110729–12).

**8.** The Court notes that all of the leasing activities at issue in this case address rights to extract natural gas *and oil* from State lands. As the parties focus on natural gas extraction,

tracts, comprising 74,000 acres, and generated roughly $163 million in one-time "bonus payments" from those transactions. In one month, then, DCNR's leasing activities generated more revenue than the prior sixty years of leasing activity combined.

The lease terms provide for two types of payments to DCNR. The first is an annual rental payment. The first rental payment due was the up-front "bonus payment" upon delivery of the lease to the lessee. These bonus payments were in the millions of dollars. Thereafter, annual rental payments were calculated on a dollars-per-acre basis. In the example lease in the record of the preliminary injunction hearing in this matter (Prelim. Inj. Hr'g Ex. R–1), the rental payment started at $20 per acre for the second through fourth years of the lease and increased to $35 per acre for every year thereafter. (*Id.* Ex. R–1, § 3.) At its highest, excluding the first year bonus payment, the annual rental on the example lease for 3,603 acres would be $126,105.00. By comparison, the bonus payment in the example lease was $4,147,053.00. The second payment due DCNR under the lease was a gas royalty, payable monthly, which was assessed based on the amount of marketable gas extracted by the lessee. (*Id.* § 4.)

Following the 2008 Lease Sale, DCNR and its Bureau of Forestry decided not to enter into further leases for natural gas extraction on State lands pending study of the "Marcellus play" and development within the 660,000 acres of land already leased within the Marcellus Shale region (including State and private lands).[9] Dr. Grace explained this decision in his hearing testimony:

A  ... Now the problem that resulted from the Marcellus development was that we had leased 74,000 acres, but there was previously leased acreages of about 250,000 acres. And then there was another 290,000 acres which we did not own the mineral rights. And Marcellus activity began on all of those acreages.

So while we had just done a 74,000–acre lease, we realized that there was going to be Marcellus development on all of the lease holdings in the entire system, which totalled almost—well, it totalled at that point about 650,000 acres.

Q  When you realized that, what action did you take?

A  At that point, we were starting to get pressure to lease additional acreages. And we felt strongly that until we could further develop and monitor what was going on, that we believed there should be no further gas leasing because we were going to be watching a tremendous amount of gas activity on the state forest for the next 50 years.

Q  Was that a decision that you helped make with the department, no further leasing?

A  That was the department's decision across the board. Yes, it was the department's decision. Yes.

(Prelim. Inj. Hr'g, N.T. 36–37.) Dr. Grace testified further about pressure to engage in further leasing following the 2008 Lease Sale:

Q.  You indicated earlier in your testimony that there was some concern about being required to issue more

however, the Court will confine its review of the leases and the issues in this case to natural gas extraction.

9.  Prelim. Inj. Hr'g Ex. R–6 (FY 2009–2010 Oil and Gas Lease Sale State Forest Environmental Review (Jan. 2010 Lease Review Document)).

leases. Can you tell the Court what your concern was and what it was based on?

A Shortly after we had the revenue from this lease, the Commonwealth in 2009, 2010, 2011 was going under very—certainly in the initial years, there was a $2 billion shortfall in the Pennsylvania general fund budget. And we were being pressured regularly from I'd say the Governor's Office and the Legislature to make additional leases to provide revenue to reduce that shortfall.

(*Id.* 39–40.)

On the heels of what DCNR characterized as a "successful" lease sale in 2008, and with a Lease Fund balance at a historical high, as part of the FY 2009–2010 budget process the General Assembly and then-Governor Ed Rendell amended the Fiscal Code [10] in 2009, creating a new Article XVI–E, dealing specifically with oil and gas wells (2009 Fiscal Code Amendments).[11] Three sections are particularly relevant. The first is Section 1603–E, which appropriated "up to $50,000,000" from "royalties" in the Lease Fund to DCNR for uses permitted under the Lease Fund Act:

Subject to the availability of money in the fund, up to $50,000,000 from the fund *from royalties* shall be appropriated annually to the department to carry out the purposes set forth in the [Lease Fund Act].... The department shall give preference to the operation and maintenance of State parks and forests.

Section 1603–E of the Fiscal Code (2009) (amended 2014) (emphasis added). The second is Section 1602–E, which provided that, with the exception of the appropriation in Section 1603–E, described above, "no money in the fund *from royalties* may be expended unless appropriated by the General Assembly." Section 1602–E of the Fiscal Code (2009) (amended 2014) (emphasis added). The final section is Section 1604–E Fiscal Code, which provides:

Notwithstanding section 1603–E or any other provision of law, in fiscal year 2009–2010 the amount of $60,000,000 shall be transferred from the fund to the General Fund.[12]

The Court reads the language of Section 1604–E as compelling the FY 2009–2010

---

10. Act of April 9, 1929, P.L. 343, *as amended,* 72 P.S. §§ 1–1805.

11. Act of October 9, 2009, P.L. 537 (Act 50).

12. "General Fund" is used to identify a fund of money in the State Treasury available for appropriation annually by the General Assembly, as approved by Governor, for general, lawful purposes. *See* Section 302 of the Fiscal Code. In this regard, the General Fund should be distinguished from special funds, which, either by the Pennsylvania Constitution or by legislation, derive their revenues from certain sources and may only be appropriated for certain purposes and/or under certain circumstances. The Motor License Fund, for example, is a special fund derived from fuel taxes and vehicle registration fees, the monies of which, under Article VIII, Section 11(a) of the Pennsylvania Constitution, may only be appropriated by the General Assembly for the construction, maintenance, and repair of the Commonwealth's highways and bridges. The State Lottery Fund is a special fund created by statute. Section 311 of the State Lottery Law, Act of August 26, 1971, P.L. 351, *as amended,* 72 P.S. § 3761–311. By that statute, all funds from the operations of the State Lottery are to be deposited in the State Lottery Fund, and all monies in that special fund may be appropriated only:

(1) For the payment of prizes to the holders of winning lottery tickets or shares.
(2) For the expenses of the division in its operation of the lottery.
(3) For property tax relief and free or reduced fare transit service for the elderly....

*Id.*

transfer of $60 million from the Lease Fund to the General Fund, with that transfer taking precedent over the (a) standing appropriation of "up to $50,000,000" of royalty monies in the Lease Fund to DCNR by Section 1603–E, and (b) the standing appropriation of all non-royalty monies in the Lease Fund to DCNR as set forth in Section 3 of the Lease Fund Act.[13] In addition to the 2009 Fiscal Code Amendments, the General Appropriations Act of 2009 (Aug. 12, 2009),[14] vetoed in part, and Supplemental General Appropriations Act of 2009 (Oct. 9, 2009)[15] directed the transfer of an additional $143 million (for a total transfer of $203 million) from the Lease Fund to the General Fund. The Court similarly interprets this transfer as taking precedent over Section 1603–E of the 2009 Fiscal Code Amendments and Section 3 of the Lease Fund Act.

### D. The 2010 Lease Sales

In direct response to the FY 2009–2010 budget and, specifically, Section 1604–E of the 2009 Fiscal Code Amendments, DCNR reversed course on its decision following the 2008 Lease Sale not to enter into further leases of State lands and, instead, proceeded with a new round of leasing in January 2010 (Jan. 2010 Lease Sale). In its January 2010 Lease Review Document, dated one month after passage of the Supplemental Appropriations Bill of 2009 and the 2009 Fiscal Code Amendments, DCNR explained:

*This lease sale is a direct result of certain line items contained within the budget agreement and fiscal code for FY 2009–10.* Following the success of the September 2008 Lease Sale, DCNR and the Bureau of Forestry had decided . . . not to offer additional lands for lease but rather study the Marcellus play and the operational developments and requirements on the 660,000 acres within the Marcellus fairway subject to valid lease agreements. Although the FY 2009–10 Oil and Gas Lease Sale will satisfy the legislated requirements, the impending sale still meets the Bureau's management guidelines and protocols.

In summary, the FY 2009–10 Oil and Gas Lease Sale conforms to the Bureau's stated policy goals. Furthermore, *this sale effort is designed to meet the legislated requirements to generate bonus bid revenues, totaling $60,000,000, for inclusion in the General Fund in FY 2009–10.*

(Prelim. Inj. Hr'g Ex. R–6 at 5 (emphasis added).) The $60 million figure is an obvious reference to the transfer from the Lease Fund to the General Fund required in Section 1604–E of the 2009 Fiscal Code Amendments.

On January 12, 2010, DCNR accepted bids for leases on six tracts of State forest land, comprising 31,967 acres. An example lease from the January 2010 Lease

13. The Court has found no legislation repealing Section 3 of the Lease Fund Act. Based on the express language of the 2009 Fiscal Code Amendments, we also disagree with Commonwealth Respondents' characterization of the 2009 Fiscal Code Amendments as encompassing an amendment to Section 3 that "capped" DCNR's continuing appropriation under the Lease Fund Act at $50 million annually. (*See* Cmwlth. Respondents' Cross Application ¶ 58 and Br. at 16.) The Lease Fund Act differentiates between rent and royalty deposits into

the Lease Fund. Section 1 of the Lease Fund Act. By referring in Sections 1602–E and 1603–E of the 2009 Fiscal Code Amendments only to "royalties" in the Lease Fund, the General Assembly's intent to leave the "rental" monies in the Lease Fund unaffected by those provisions is evident.

14. Pa. Senate Bill 850 (2009).

15. Pa. House Bill 1416 (2009).

Sale[16] is structured similarly to the example lease from the earlier 2008 Lease Sale.[17] Specifically, the lease provides for an up-front "bonus payment," which in the example lease is over $4 million and which serves as the first year's rental payment. There are annual rental payments thereafter as well as gas royalty payments on extracted gas.

Following the January 2010 Lease Sale, DCNR reverted to its post–2008 Lease Sale position and decided not to offer additional lands for lease, opting instead to study natural gas development on already leased lands.[18] But, within a few months of the January 2010 Lease Sale, DCNR, referring to "legislated requirements" to generate revenue for the General Fund, would again reverse course:

> Following the FY 2009–10 Lease Sale, DCNR and the Bureau of Forestry had decided not to offer additional lands for lease but rather study the Marcellus play and the operational developments and requirements on the 700,000 acres (approximate) within the Marcellus fairway subject to valid lease agreements. *However, due to projected shortfalls in the Commonwealth Budget, the Bureau of Forestry has been mandated to generate $180 million for the Commonwealth. This lease offering is a directed result of the budget agreement and fiscal code for FY 2009–10.* While counter to DCNR's planning following the FY 2009–10 Lease Sale, based on the comprehensive Environmental Review and resulting compilation of lease tracts, which incorporates many surface use restrictions designed to minimize environmental and

social impacts, the impending sale meets the Bureau's management guidelines and protocols.

> In summary, *while the decision to conduct this lease sale was based on the legislated requirements to generate bonus bid revenues of $180 million for inclusion in the FY 2010–11 General Fund,* this Oil and Gas Lease Sale conforms to the Bureau's stated policy and goals.

(May 2010 Lease Review Document (emphasis added).)

Accordingly, DCNR engaged in a May 10, 2010 lease sale with a single bidder—Anadarko E & P Company LP (Anadarko Lease Sale). The May 2010 Lease Review Document provides that the Anadarko Lease Sale included eleven tracts of State forest land, covering approximately 33,000 acres. Bonus payment revenue (a/k/a first annual rental payment) under the lease was approximately $120 million. According to Dr. Grace, bonus payment revenue to DCNR from the January 2010 Lease Sale and the Anadarko Lease Sale, which encompassed approximately 65,000 acres of State land in the aggregate, was about $250 million.[19]

As noted above, the decision to pursue the Anadarko Lease Sale was driven by a mandate to DCNR to generate $180 million in revenue for the General Fund for FY 2010–2011. When it came time for the General Assembly to face budgetary challenges in FY 2010–2011 similar to those it faced for the prior fiscal year, the General Assembly again amended the Fiscal Code, specifically Article XVI–E, to provide an

---

16. Prelim. Inj. Hr'g Ex. R–3.

17. The Court notes that Dr. Grace executed the leases from the 2008 Lease Sale and the January 2010 Lease Sale on behalf of DCNR.

18. Prelim. Inj. Hr'g Ex. R–7 (May 2010 Oil and Gas Lease Offering State Forest Environmental Review (May 2010 Lease Review Document)).

19. Prelim. Inj. Hr'g, N.T. 13–14, 58–59 (May 28, 2014).

additional transfer of monies from the Lease Fund to the General Fund.[20] This time the amount transferred was $180 million (three times the amount of the transfer for FY 2009–2010), which corresponded to the directive that DCNR received following that January 2010 Lease Sale to generate additional revenue for the General Fund. *See* Section 1605–E of the Fiscal Code.

## E. The Leasing Moratorium

On October 26, 2010, after years of relying on over $200 million in revenue generated by the leasing of almost 140,000 acres of State forest land to balance the Commonwealth budget,[21] and only months before leaving office, Governor Rendell signed Executive Order No. 2010–05 (Rendell Executive Order).[22] In that Executive Order, Governor Rendell noted that more than 700,000 acres of State forest and park land was subject to oil and natural gas development. He noted the significant development activity that has occurred on those lands and that is likely to occur on those lands in the future:

> [I]n the next 10 to 20 years, full development of the gas in the Marcellus shale formation on state forest and state park land currently subject to drilling will result in the use of more than 30,000 acres for an estimated 1,100 well pads and associated infrastructure, access roads and pipelines[.]

(Rendell Executive Order at 2.) He wrote:

> [A]dditional leasing of state forest and state park land for oil and gas development will jeopardize DCNR's ability to fulfill its duty to conserve and maintain

this public natural resource and sustain its … forest certification.

(*Id.*) For these and other reasons explained in the Executive Order, Governor Rendell placed a moratorium on further leasing:

> As of the date of this Executive Order, to protect the lands of the commonwealth, no lands owned and managed by DCNR shall be leased for oil and gas development.

(*Id.* at 3.)

## F. FY 2011–2012 and 2012–2013 Budgets

For FY 2011–2012, Governor Corbett's first budget year as Governor Rendell's successor, Article XVI, Section 1601 of the General Appropriations Act of 2011 (2011 GAA)[23] provided for an appropriation from the Lease Fund to DCNR in the amount of $15 million dollars for "State parks operations." Based on Section 1602–E of the Fiscal Code, this appropriation to DCNR was an appropriation of *royalties* in the Lease Fund and effectively supplemented the standing "up to $50 million" in *royalties* appropriated to DCNR in Section 1603–E of the Fiscal Code. As noted above, *rental* monies in the Lease Fund, which includes bonus payments, are subject to a separate standing appropriation under Section 3 of the Lease Fund Act. Section 210 of the 2011 GAA also included a General Fund appropriation to DCNR of $55,288,000. Of that General Fund appropriation, the General Assembly designated $17,114,000 for general governmental operations, $27,534,000 for State parks operations,[24] and $5,811,000 for State forests

---

**20.** Act of July 6, 2010, P.L. 279, § 2.4.

**21.** Pa. Const. art. VIII, §§ 12, 13 (requiring balanced operating budget for the Commonwealth).

**22.** Prelim. Inj. Hr'g Ex. P–8.

**23.** Pa. House Bill 1485 (June 30, 2011).

**24.** Added to the Lease Fund appropriation, the General Assembly appropriated approximately $42.5 million from the General Fund

operations (a total of $50,459,000). It does not appear that the General Assembly mandated any transfers from the Lease Fund to the General Fund or other executive branch agencies in FY 2011–2012.

The General Appropriations Act of 2012 (2012 GAA) was similarly structured.[25] Under Section 1601 of the 2012 GAA, the royalty appropriations from the Lease Fund Act to DCNR were $17,511,000 for State parks operations and $2,000,000 for forest pest management. The General Fund appropriation to DCNR was $52,723,000 for general governmental operations and other specified purposes. Again, there did not appear to be any transfers from the Lease Fund to the General Fund.

### G. FY 2013–2014 Budget and Act 13

Section 210 of the General Appropriations Act of 2013 (2013 GAA)[26] decreased DCNR's General Fund appropriation to $30,006,000.[27] Meanwhile, the royalty appropriation from the Lease Fund to DCNR in Section 1601 of the 2013 GAA increased significantly from the prior fiscal year to $39,160,000 for State parks operations and $17,386,000 for State forests operations (not just forest pest management, as was the case in the 2012 GAA). But, again, there does not appear to be any transfer from the Lease Fund to the General Fund for FY 2013–2014.

Prior to the passage of the 2013 GAA, however, the General Assembly passed

and Governor Corbett signed into law Act 13 of 2012, a statute amending the Pennsylvania Oil and Gas Act ("Act 13").[28] Section 2315 of Act 13 created a new special fund within the State Treasury called the Marcellus Legacy Fund ("Legacy Fund"). Act 13 provides two funding sources for the Legacy Fund. The first is the transfer of a portion of the revenue generated by fees collected on unconventional gas wells and deposited into another special fund called the Unconventional Gas Well Fund ("Well Fund"). 58 Pa.C.S. §§ 2314, 2315(a.1). The second is annual appropriations from the Lease Fund to the Legacy Fund—$20 million in 2013, $35 million in 2014, $40 million in 2015, and $50 million in 2016 and each year thereafter. *Id.* §§ 2504, 2505(b). These appropriations of royalty monies from the Lease Fund to the Legacy Fund, however, are lower in priority than existing appropriations to DCNR from the Lease Fund: ·

> Funds appropriated from the [Lease Fund] to the department under the ... Fiscal Code, or other appropriation act shall be distributed prior to allocations under subsection (b).

*Id.* § 2505(a). In other words, these appropriations of royalties to the Legacy Fund occur only *after* distribution of $50 million in royalty monies from the Lease Fund as appropriated under Section 1603–E of the Fiscal Code, and the appropriations cannot be made out of rental monies held within the Lease Fund.[29]

to DCNR for State parks operations in FY 2011–2012.

**25.** Pa. Senate Bill 1466 (June 30, 2012).

**26.** Pa. House Bill 1437 (June 30, 2013).

**27.** Effort has been made to relay accurately these appropriation figures. To the extent there is some inaccuracy, the Court deems the inaccuracies immaterial to resolution of the

cross-applications for summary judgment, as these figures are offered for background purposes only.

**28.** Act of February 14, 2012, P.L. 87, 58 Pa. C.S. §§ 2301–3504.

**29.** As noted above, all rental monies in the Lease Fund are distributed to DCNR as appropriated under Section 3 of the Lease Fund Act.

Once transferred to the Legacy Fund, the monies are distributed to one of two other special funds: (1) the Environmental Stewardship Fund (Stewardship Fund) and (2) the Hazardous Sites Cleanup Fund (Cleanup Fund). The Stewardship Fund is a special fund within the State Treasury created in 1999 under the Environmental Stewardship and Watershed Protection Act, and DCNR is appropriated 24.1% of the money in the Stewardship Fund.[30] DCNR must use its appropriation from the Stewardship Fund as follows:

(i) To rehabilitate, repair and develop State park and State forest lands and facilities and the acquisition of interior lands within State parks and State forests.

(ii) To provide grants to a county or other municipality, council of governments, conservation districts and authorized organizations for the purpose of planning, education, acquisition, development, rehabilitation and repair of greenways, recreational trails, open space, natural areas, river corridors, watersheds, community and heritage parks and recreation facilities; community conservation and beautification projects; forest conservation; and other conservation purposes....

(iii) To provide grants to a county or other municipality and authorized organizations for the purpose of research, planning, inventories and technical assistance intended to protect and conserve the biological diversity of this Commonwealth.

*Id.* § 6105(a)(1). DCNR also may use appropriated monies from the Stewardship Fund "for the purchase or improvement of park land to be used for public recreation." *Id.* § 6105(f).

Monies in the Stewardship Fund also are appropriated to two other Commonwealth agencies—DEP (37.4%) and the Department of Agriculture (Agriculture) (14.8%)—and to the Pennsylvania Infrastructure Investment Authority (PENN-VEST) (23.7%). 27 Pa.C.S. § 6104(c), (d).

## H. Moratorium Modification

On May 23, 2014, Governor Corbett signed Executive Order No. 2014–03 (Corbett Executive Order). That order rescinded the Rendell Executive Order, which placed a blanket moratorium on the further leasing of State lands for oil and gas development. In·place thereof, the Corbett Executive Order bans further leasing of State lands for oil and natural gas development "which would result in additional surface disturbance on state forest or state park lands." (Corbett Executive Order at 3.) The Corbett Executive Order further provides that "royalty revenue" generated by oil and natural gas leasing and development be used for the following activities:

a. repair and improve upon the infrastructure and amenities of the state forest and state park systems;

b. prioritize and acquire high-value inholding lands, indentures and areas of high conservation value or ecological importance; and

c. prioritize and acquire privately-owned oil, natural gas, and other mineral rights underlying high-value surface lands owned by DCNR.

(*Id.*)

## I. FY 2014–2015 Budget

On July 10, 2014, Governor Corbett signed two pieces of budget-related legislation for Commonwealth FY 2014–2015. The first was the General Appropriations

---

**30.** Act of December 15, 1999, P.L. 949, *as amended,* 27 Pa.C.S. §§ 6101–6119.

Act of 2014 (2014 GAA).[31] The 2014 GAA funds, in substantial part, DCNR operations for FY 2014–2015 with $72,546,000 held in the Lease Fund as follows: (1) for general DCNR operations, $10 million; (2) for State park operations, $45,009,000; and (3) for State forest operations, $17,537,000. Section 1601 of the 2014 GAA. This was a substantial increase from prior fiscal years in the amount of dollars appropriated from the Lease Fund to fund DCNR operations.[32] There is a corresponding decrease in the amount of monies appropriated by the General Assembly to DCNR from the General Fund.

The second piece of legislation[33] included amendments to Article XVI–E of the Fiscal Code (2014 Fiscal Code Amendments). The 2014 Fiscal Code Amendments added, *inter alia,* a new Section 1601.1–E, titled "Legislative Findings."[34] That new section provides:

The General Assembly finds and declares as follows:

(1) Revenue from the leasing of State land to extract natural gas is necessary to obtain the revenue necessary to effectuate the [2014 GAA].

(2) Leases utilized by [DCNR] include provisions that are highly protective of the ecological integrity of State forest lands and carefully crafted to minimize impacts to rare and endangered plants, wildlife and their habitat and the vast number of streams and watersheds that are part of State forest and park lands.

(3) Leases utilized by [DCNR] for shale gas provide for enhanced environmental and surface protections, including:

(i) Increased setback distances from critical recreation infrastructure, streams and water features, State parks and designated wild and natural areas.

(ii) Limiting the amount of surface area disturbed, prohibiting shallow well drilling and authorizing the application of strict forestry resource management principles.

(iii) Limiting the number of well pads allowed to be constructed on the lease tract; providing for deep drilling insurance; and prohibiting the development of the ecologically sensitive areas, including designated wild and natural areas and areas of special con-

---

31. Pa. House Bill 2328 (July 10, 2014).

32. This also appears to be a $45 million reduction from the amount that Governor Corbett proposed in his Executive Budget as an appropriation from the Lease Fund to fund DCNR's operations. *See* 2014–15 Executive Budget, submitted to the General Assembly on or about February 4, 2014 (Executive Budget) at E12.4.

33. Pa. House Bill 278 (July 10, 2014).

34. As noted above in our discussion of the 2009 Fiscal Code Amendments, the 2014 Fiscal Code Amendments added language to Sections 1602–E and 1603–E. Section 1602–E of the Fiscal Code, as amended, now provides:
Notwithstanding any other provision of law and except as provided in section 1603–E, no money in the fund from royalties may be expended unless appropriated *or transferred to the General Fund* by the General Assembly *from the [Lease] [F]und.* In making appropriations, the General Assembly shall consider the adoption of an allocation to municipalities impacted by a Marcellus well.
(Emphasis added.) Section 1603–E of the Fiscal Code, as amended, nor provides:
Subject to the availability of money in the fund *following transfers,* up to $50,000,000 from the fund from royalties shall be appropriated annually to the department to carry out the purposes set forth in the [Lease Fund Act]. . . . The department shall give preference to the operation and maintenance of State parks and forests.
(Emphasis added.)

sideration, without [DCNR's] prior written approval.

(4) [DCNR] continually updates and employs best management practices when managing oil and gas activities on State forest lands to ensure that shale gas activities are consistent with the recreational and ecological uses of State forest.

(5) [DCNR] has implemented a Shale Gas Monitoring Program to monitor, evaluate and report any impacts of shale gas development on the State forest system.

(6) The [Lease] [F]und is not a constitutional trust.

(7) Money in the [Lease] [F]und has increased exponentially from the extraction of shale gas and the implementation of new gas extraction techniques.

(8) The Commonwealth's role as trustee of the public's natural resources is broader and more comprehensive than just conserving the State forest and parks.

(9) The General Assembly affirms its intent that:

(i) [DCNR] should continue the operation of the shale gas monitoring activities program to monitor, evaluate and report the impacts of shale gas activities in State forest and, in consultation with the Governor's Office, utilize data received from ongoing monitoring to adjust its management planning and practices.

(ii) [DCNR] should consider the State forest and park lands as one of the Commonwealth's interests when considering whether or not to lease additional State forest and park lands and determining what is in the best interests of the Commonwealth. Interest involved in decisions relating to

leasing State forest and park lands should not be made to the exclusion of all other interests of the Commonwealth.

(iii) Notwithstanding any other law to the contrary, it is in the best interest of the Commonwealth to lease oil and gas rights in State forests and parks if [DCNR]:

(A) in consultation with the Governor, continues strong and effective lease protections, best management practices and ongoing monitoring programs on the impact of gas operations; and

(B) maintains a balance of money in the [Lease] [F]und to carry out [DCNR's] statutory obligation to protect State forest and park land and other environmental activities.

(10) If a balance in the [Lease] [F]und is adequate to achieve the purposes of paragraph (9), transfers to the General Fund are permissible.

The 2014 Fiscal Code Amendments also amended Section 1605–E by providing for a transfer from the Lease Fund to the General Fund:

(b) Fiscal Year 2014–2015.—Notwithstanding section 1603–E or any other provision of law, in fiscal year 2014–2015, the amount of $95,000,000 shall be transferred from the [Lease] [F]und to the General Fund.

Section 1605–E(b) of the Fiscal Code. This transfer is $20 million more than the transfer that Governor Corbett proposed in his Executive Budget.[35]

In sum, the 2014 Fiscal Code Amendments, like the 2009 Fiscal Code Amendments and the amendment to the Fiscal Code in 2010, mandate an outright transfer from the Lease Fund to the General Fund

---

**35.** *See* Executive Budget at C1.6.

to support the 2014 GAA. This transfer coincides with Governor Corbett's modification of the leasing moratorium to allow for "non-surface disturbance" leasing of State land for oil and gas development. The 2014 GAA appropriates an additional $72,546,000 in royalty monies from the Lease Fund to DCNR for its operations. This is in addition to the standing appropriation of "up to" $50 million, assuming funds available, in royalties from the Lease Fund to DCNR in Section 1603–E of the Fiscal Code. Finally, the standing appropriation of $35 million under Act 13 from the Lease Fund to the Legacy Fund remains, assuming funds available. The commitment of Lease Fund dollars for FY 2014–2015 can be illustrated as follows:

All told, the foregoing legislative enactments contemplate spending in excess of $250 million from the Lease Fund in FY 2014–2015.

## III. STANDARD FOR SUMMARY RELIEF

Declaratory judgment actions within the Court's original jurisdiction fall within the scope of Chapter 15 of the Pennsylvania Rules of Appellate Procedure. *See* Pa. R.A.P. 1501(a)(3), 1532(b). "Summary relief under Pa. R.A.P. 1532(b) is similar to the relief envisioned by the rules of civil procedure governing summary judgment." *Brittain v. Beard,* 601 Pa. 409, 974 A.2d 479, 484 (2009). " 'An application for summary relief may be granted if a party's right to judgment is clear and no material issues of fact are in dispute.' " *Jubelirer v. Rendell,* 598 Pa. 16, 953 A.2d 514, 521 (2008) (quoting *Calloway v. Pa. Bd. of Prob. & Parole,* 857 A.2d 218, 220 n. 3 (Pa.Cmwlth.2004)).

The purpose of the Declaratory Judgments Act is to "settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and is to be liberally construed and administered." 42 Pa.C.S. § 7541(a). An action brought under the Declaratory Judgments Act " 'must allege an interest by the party seeking relief which is direct, substantial and present, . . . and must demonstrate the existence of an actual controversy related to the invasion or threatened invasion of one's legal rights.' " *Bowen v. Mount Joy Twp.*, 165 Pa. Cmwlth. 101, 644 A.2d 818, 821 (quoting *Pa. Institutional Health Servs., Inc. v. Dep't of Corr.*, 158 Pa.Cmwlth. 221, 631 A.2d 767, 771 (1993)), *appeal denied*, 539 Pa. 682, 652 A.2d 1326 (Pa.1994). Granting or denying an action for a declaratory judgment is committed to the sound discretion of a court of original jurisdiction. *Gulnac by Gulnac v. S. Butler Cnty. Sch. Dist.*, 526 Pa. 483, 587 A.2d 699, 701 (1991).

We note as well that PEDF seeks summary relief with respect to constitutional challenges to enacted legislation. The law is well-established that "legislation will not be declared unconstitutional unless it clearly, palpably and plainly violates the Constitution, with any doubts being resolved in favor of constitutionality." *Harristown Dev. Corp. v. Dep't of Gen. Servs.*, 532 Pa. 45, 614 A.2d 1128, 1132 (1992). "The party seeking to overcome the presumption of validity bears a heavy burden of persuasion." *W. Mifflin Area Sch. Dist. v. Zahorchak*, 607 Pa. 153, 4 A.3d 1042, 1048 (2010).

## IV. ANALYSIS

### A. Scope of Issues

PEDF initiated this declaratory judgment action on March 19, 2012, by filing a petition for review in this Court's original jurisdiction. PEDF's original petition for review has since been amended and supplemented. In its current iteration—the Second Amended Petition for Review in the Nature of an Action for Declaratory Relief (Petition), PEDF challenges the foregoing budget-related decisions from Commonwealth FY 2009–2010 through FY 2014–2015 relating to (a) the leasing of State lands for oil and natural gas development and (b) the use of the monies in the Lease Fund. PEDF maintains that these decisions—past, present, and future—violated the rights of all Commonwealth citizens conferred by Article I, Section 27 of the Pennsylvania Constitution, (also known as the "Environmental Rights Amendment"), the CNRA, and the Lease Fund Act. PEDF seeks numerous declarations from this Court relating to those challenges.

PEDF's claims in this action place the Court at a crossroad where the law and policy intersect. Its more than 100-page brief in support of its application for summary relief, along with supporting exhibits and addenda, are devoted largely to establishing the importance of the Commonwealth's scenic and natural resources to all present and future Pennsylvanians. This is an unassailable truth, and one that, through the wisdom and foresight of our citizenry, is enshrined in the Environmental Rights Amendment.

But, it is an equally unassailable truth enshrined in our governing document that the legislative and executive branches must annually reach agreement on a balanced plan to fund the Commonwealth's operations for the fiscal year, including funding for vital services to the most vulnerable among us in all corners of the Commonwealth. And, how they do this is as much a matter of policy as it is a matter of law, only the latter of which is reviewable by the judicial branch. Decisions to reduce a General Fund appropriation to an

agency, even to an agency with constitutional duties, are matters of policy. Whether monies in a special fund may be used for a particular purpose, however, is a question of law fully reviewable by the Court. A decision to sell surplus vehicles or office equipment to help fund governmental operations is a matter of policy. But, a decision to lease Commonwealth property protected by the Constitution and held in trust for the benefit of all current and future Pennsylvanians is an appropriate subject of judicial scrutiny.

In its brief in support of its application for summary relief, PEDF presents approximately twenty questions for the Court's consideration. Some of these questions request that the Court outline in general terms the respective rights, privileges, and duties under the Environmental Rights Amendment, the Lease Fund Act, and the CNRA. Others ask the Court to make sweeping factual findings about the "immediate and long term negative impacts" of extracting natural gas on State lands. Still others request that the Court make rulings on the constitutionality of budget proposals, not enacted legislation. In our judgment, resolution of these and similar questions is not necessary or appropriate under the Declaratory Judgments Act, as they do not go to the heart of a particular and concrete dispute between PEDF and the Commonwealth Respondents. In addition, the Court will refrain from deciding the legality of the 2008 Lease Sale, the January 2010 Lease Sale, or the Anadarko Lease Sale in this lawsuit,

as we view the lessees in those transactions as indispensable parties to those inquiries.[36]

We have carefully reviewed the questions posed by PEDF and Commonwealth Respondents in their cross-applications for summary relief. Based on that review, we will consider the parties' contentions in their cross-applications only as they relate to the following issues raised by PEDF in its pleadings, which we conclude are appropriate for review by this Court under the Declaratory Judgments Act:

(1) Whether Sections 1602–E and 1603–E of the Fiscal Code, which respectively provide that the General Assembly shall appropriate all royalty monies the Lease Fund and that, subject to availability, up to $50 million of the Lease Fund royalties shall be appropriated to DCNR, violate Article I, Section 27;

(2) Whether the General Assembly's transfers/appropriations from the Lease Fund violate Article I, Section 27; and

(3) Who within the Commonwealth has the duty and thus bears the responsibility to make determinations with respect to the leasing of State lands for oil and natural gas extraction.

To the extent PEDF and Commonwealth Respondents proffer questions in addition to and that cannot be considered subsidiary to the questions outlined above, we decline to resolve them under the Declara-

---

**36.** We recently observed:

> Because the absence of an indispensable party goes absolutely to the jurisdiction of the court, an objection on this ground cannot be waived, and may be raised at any time. The basic inquiry in determining whether a party is indispensable concerns whether justice can be done in the absence of him or her. A party is generally regarded to be indispensable when his or her

> rights are so connected with the claims of the litigants that no decree can be made without impairing those rights.

*In re Silverman*, 90 A.3d 771, 779 (Pa. Cmwlth.2014) (en banc) (citations omitted). *Cf. Milestone Materials, Inc. v. Dep't of Conservation and Natural Res.*, 730 A.2d 1034 (Pa.Cmwlth.1999) (finding agreement for removal of minerals from state lands unlawful and ordering rescission).

tory Judgments Act and in the context of this litigation.

## B. The Environmental Rights Amendment

The Environmental Rights Amendment provides:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic, and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Pa. Const. art. I, § 27. According to our Supreme Court,

> A legal challenge pursuant to Section 27 may proceed upon alternate theories that either the government has infringed upon citizens' rights or the government

has failed in its trustee obligations, or upon both theories, given that the two paradigms, while serving different purposes in the amendatory scheme, are also related and overlap to a significant degree.

*Robinson Twp. v. Commonwealth,* 623 Pa. 564, 83 A.3d 901, 950–51 (2013) (plurality).[37]

The first clause of the Environmental Rights Amendment "requires each branch of government to consider in advance of proceeding the environmental effect of any proposed action on the constitutionally protected features." *Id.* at 952. When faced with a challenge to government action under this clause, our Supreme Court has advised:

> Courts are equipped and obliged to weigh parties' competing evidence and arguments, and to issue reasoned decisions regarding constitutional compli-

---

**37.** Part III of the Pennsylvania Supreme Court's lead opinion in *Robinson Township.,* authored by Chief Justice Castille, garnered the support of only two joining justices, Justices Todd and McCaffery. Part III, therefore, represents a plurality view of the Supreme Court. The legal reasoning and conclusions contained therein are thus not binding precedent on this Court. *Kelly v. State Emps.' Ret. Bd.,* 593 Pa. 487, 932 A.2d 61, 67–68 (2007). Nonetheless, in reviewing the accompanying minority opinions, it does not appear that any of the concurring and dissenting justices disputed the plurality's construction of the Environmental Rights Amendment, including the rights declared therein and attendant duties imposed thereby on the Commonwealth. In his concurring opinion, Justice Baer, while praising the plurality opinion as "thorough, well-considered, and able," preferred to analyze the constitutional challenge in that case as one based on substantive due process, rather than a direct violation of the Environmental Rights Amendment. *Robinson Twp.,* 83 A.3d at 1000–09 (Baer, J., concurring). In his dissenting opinion, Justice Saylor is more direct, criticizing the

plurality for deviating from the thrust of the challengers' constitutional argument, which, like Justice Baer, Justice Saylor couches as a substantive due process challenge to Act 13. Nonetheless, like Justice Baer, Justice Saylor expressly differs only with the plurality in terms of its approach to the challengers' constitutional claim. *Id.* at 1009–14 (Saylor, J., dissenting). Justice Eakin joined Justice Saylor's dissenting opinion, writing separately to express his disagreement with the decision of a majority of justices to allow municipalities to bring claims against the Commonwealth to vindicate rights conferred by the Pennsylvania Constitution on individuals. *Id.* at 1014–16 (Eakin, J., dissenting). For our purposes, we find the plurality's construction of Article I, Section 27 persuasive only to the extent it is consistent with binding precedent from this Court and the Supreme Court on the same subject. *See, e.g., Cmty. Coll. of Del. Cnty. v. Fox,* 20 Pa.Cmwlth. 335, 342 A.2d 468 (1975) (en banc); *Payne v. Kassab,* 11 Pa.Cmwlth. 14, 312 A.2d 86 (1973) (en banc), *aff'd,* 468 Pa. 226, 361 A.2d 263 (1976).

ance by the other branches of government. The benchmark for decision is the express purpose of the Environmental Rights Amendment to be a bulwark against actual or likely degradation of, *inter alia,* our air and water quality.

*Id.* at 953. With respect to the preservation of "natural, scenic, historic and esthetic values of the environment," our Supreme Court held that the Environmental Rights Amendment protects the people from governmental action that *"unreasonably* causes actual or likely deterioration of these features." *Id.* (emphasis added). The Supreme Court, however, recognized the state's legitimate interest in the economic welfare of its citizens. To balance the "inviolate" rights conferred on the people under the Environmental Rights Amendment with that legitimate state interest, the Supreme Court held that "economic development cannot take place at the expense of an unreasonable degradation of the environment" and that the police power to promote the economic welfare of the citizens "must be exercised in a manner that promotes sustainable property use and economic development." *Id.* at 954.

The second and third clauses of the Environmental Rights Amendment create a public trust in favor of the people (*i.e.,* the trust beneficiaries), including future generations, which encompasses our public natural resources, which include, *inter alia,* state-owned lands and mineral reserves (*i.e.,* the corpus of the trust). *Id.* at 955–56. The Commonwealth is the named trustee of this public trust: "As trustee, the Commonwealth is a fiduciary obligated to comply with the terms of the trust and with standards governing a fiduciary's conduct." *Id.* at 957. The Supreme Court described the Commonwealth's trustee obligations as two-fold:

[T]he Commonwealth has an obligation to refrain from performing its trustee duties respecting the environment unreasonably, including via legislative enactments or executive action. As trustee, the Commonwealth has a duty to refrain from permitting or encouraging the degradation, diminution, or depletion of public natural resources, whether such degradation, diminution, or depletion would occur through direct state action or indirectly, *e.g.,* because of the state's failure to restrain the actions of private parties. . . .

The second obligation peculiar to the trustee is . . . to act affirmatively to protect the environment, via legislative action.

*Id.* at 957–58. Again, as with its exposition on the first clause, the Supreme Court tempers its analysis with recognition of the legitimate state interest to promote economic development for the benefit of all Pennsylvanians, present and future:

[A]s with the rights affirmed by the first clause of Section 27, the duties to conserve and maintain are tempered by legitimate development tending to improve upon the lot of Pennsylvania's citizenry, with the evident goal of promoting sustainable development.

. . . [T]he trustee has an obligation to deal impartially with all beneficiaries and . . . the trustee has an obligation to balance the interests of present and future beneficiaries. . . . The Environmental Rights Amendment offers protection equally against actions with immediate severe impact on public natural resources and against actions with minimal or insignificant present consequences that are actually or likely to have significant or irreversible effects in the short or long term.

*Id.* at 958–59 (citations omitted).

In *Payne v. Kassab,* 11 Pa.Cmwlth. 14,

312 A.2d 86 (1973) (en banc) (*Payne I* ),[38] a group of citizens and students from a local college challenged a street-widening plan in the City of Wilkes–Barre that proposed to eliminate a portion of a park area known as River Common. Because of the historical significance of the parcel, this Court held that the development of the property was subject to protection under both the Environmental Rights Amendment and Section 13 of the Act of May 6, 1970, P.L. 356 (Act 120), *as amended,* 71 P.S. § 512. *Payne I,* 312 A.2d at 93. Act 120 provides, in relevant part:

> No highway, transit line, highway interchange, airport, or other transportation corridor or facility, shall be built or expanded in such a way as to use any land from any recreation area, wildlife and/or waterfowl refuge, historic site, State forest land, State game land, wilderness areas or public park unless: (i) there is no feasible and prudent alternative to the use of such land, and (ii) such corridor or facility is planned and constructed so as to minimize harm to such recreation area, wildlife and/or waterfowl refuge, historic site, State forest land, State game land, wilderness area, or public park.

Section 13(a)(15) of Act 120. This Court devised a multifactorial test to determine whether the proposed incursion into protected lands violated the Environmental Rights Amendment:

> (1) Was there compliance with all applicable statutes and regulations relevant to the protection of the Commonwealth's public natural resources? (2) Does the record demonstrate a reasonable effort to reduce the environmental incursion to a minimum? (3) Does the environmental harm which will result from the challenged decision or action so clearly outweigh the benefits to be derived therefrom that to proceed further would be an abuse of discretion?

*Payne I,* 312 A.2d at 94. Applying this test, we determined that the widening of the street and encroachment upon historic lands complied with the standard in both Act 120 and passed constitutional muster under Article I, Section 27. *Id.* at 95–96.

On appeal, our Supreme Court affirmed. *Payne v. Kassab,* 468 Pa. 226, 361 A.2d 263 (1976) (*Payne II* ).[39] The Supreme Court opined that the Commonwealth's duties under the Environmental Rights Amendment must be balanced against the other duties owed by the Commonwealth to its citizens:

> But merely to assert that one has a common right to a protected value under

---

**38.** The same year this Court decided *Payne I,* we issued our decision in *Commonwealth v. National Gettysburg Battlefield Tower, Inc.,* 8 Pa.Cmwlth. 231, 302 A.2d 886 (en banc) (*Gettysburg Tower* ), *aff'd,* 454 Pa. 193, 311 A.2d 588 (1973), wherein a majority of the Court *en banc* held that Article I, Section 27 "has its own value"—*i.e.,* that it is self-executing and thus does not require any implementing legislation. *Gettysburg Tower,* 302 A.2d at 892; *accord Cmty. Coll. of Del. Cnty.,* 342 A.2d at 474; *Payne I,* 312 A.2d at 97. The Supreme Court's decision in *Gettysburg Tower,* affirming this Court's decision, was deeply divided. Of the seven justices deciding the case, only two (Justices O'Brien and Pomeroy) wrote in disagreement of this Court's decision that the Environmental Rights Amendment was self-executing. *See Robinson Twp.,* 83 A.3d at 964–65 (breaking down positions of justices in *Gettysburg Tower* case). Thus, our decision in *Gettysburg Tower* that the Environmental Rights Amendment is self-executing remains binding precedent.

**39.** In so doing, the Supreme Court did not necessarily adopt this Court's *Payne I* multifactorial test, noting that the test largely mirrored the factors that our Court would consider in reviewing a decision by the Pennsylvania Department of Transportation for compliance with Act 120. *See Payne II,* 361 A.2d at 273 n. 23.

the trusteeship of the State, and that the value is about to be invaded, creates no automatic right to relief. The new amendment speaks in no such absolute terms. The Commonwealth as trustee, bound to conserve and maintain public natural resources for the benefit of all the people, is also required to perform other duties, such as the maintenance of an adequate public highway system, also for the benefit of all the people. *It is manifest that a balancing must take place,* and by Act 120 . . . the legislature has made careful provision for just that. *Thus an area such as the River Common is to be avoided altogether for highway purposes if possible, but, if there is no feasible alternative, may be utilized in such a way as to minimize the environmental or ecological impact of the use.* The elaborate safeguards provided by Act 120, if truly complied with by the governmental departments and agencies involved, vouchsafe that a breach of the trust established by Art. I, § 27 will not occur. Having determined that Act 120 was complied with, we have no hesitation in deciding that the appellee Commonwealth of Pennsylvania has not failed in its duties as trustee under the constitutional article.

*Payne II,* 361 A.2d at 273 (emphasis added) (citations omitted) (footnote omitted). In short, because the statutory standard was met, there was no constitutional violation.

We note here that the plurality in *Robinson Township* was critical of the multifactorial test established by this Court in *Payne I,* characterizing the analysis as lacking foundation in the text of the Environmental Rights Amendment. *Robinson Twp.,* 83 A.3d at 966–67. According to the plurality, the *Payne I* test remains viable in only "the narrowest . . . of cases, *i.e.,* those cases in which a challenge is premised simply upon an alleged failure to comply with statutory standards enacted to advance Section 27 interests." *Id.* at 967. In the absence of a majority opinion from the Supreme Court or a decision from this Court overruling *Payne I,* that opinion is still binding precedent on this Court. The Supreme Court's decision in *Payne II* is also helpful precedent, particularly where the Commonwealth contends that its duties as trustee under the Environmental Rights Amendment must be balanced against other duties owed to the people of the Commonwealth.

## C. Constitutionality of Section 1602–E and 1603–E of the Fiscal Code

### 1. Section 1602–E

As noted above, Section 1602–E of the Fiscal Code provides that the General Assembly shall appropriate all royalty monies in the Lease Fund. This section, added to the Fiscal Code in 2009, effectively removed royalty monies in the Lease Fund from the standing appropriation to DCNR in Section 3 of the Lease Fund Act. In its brief in support of summary judgment, PEDF strongly criticizes the enactment of Section 1602–E, contending that the power to determine the appropriate use of the royalty monies should have remained with DCNR as the agency with the scientific and technical expertise to understand how to best use those resources to enhance and protect our State parks and forests. PEDF claims that the provision violates the Environmental Rights Amendment in the following respects: (1) it permanently removes protections under the CNRA, affording DCNR on one hand the authority to enter into leases of State land for oil and natural gas development while empowering DCNR to use the revenue from those leases to mitigate the impact of those activities on and to improve the Commonwealth's natural resources; (2) it takes away DCNR's abili-

ty to act as the trustee of State parks and forests by authorizing the General Assembly to appropriate monies in the Lease Fund for purposes other than the conservation and protection of the Commonwealth's historic and natural resources; and (3) it removes from the corpus of the Article I, Section 27 trust revenues generated by the leasing of State lands.

PEDF draws connections between the passage of Section 1602–E and the General Assembly's decision, pursuant to that authority, to direct Lease Fund dollars to fund DCNR operations and to influence DCNR into entering into additional lease arrangements, both of which PEDF also challenges. PEDF's contention that the General Assembly's passage of Section 1602–E was more about exercising control over certain funds as a budget-balancing device than about protecting the environment is not without support in the record. But, an inquiry into the motives of the General Assembly is not part of our constitutional inquiry. On this, our Supreme Court has been clear:

> We note at the outset that it is a fundamental principle in our conception of judicial authority that courts are not to inquire into the wisdom, reason or expediency behind a legislative enactment. Nor are the motives of the legislators in passing the act open to judicial consideration. Our inquiry in such cases can only be directed to the manner in which the legislature effectuates its will, to insure that the enactment does not transgress some specific constitutional prohibition.

*Commonwealth v. Sutley*, 474 Pa. 256, 378 A.2d 780, 782 (1977) (citations omitted).

DCNR exists by act of the General Assembly, and its powers and duties are those extended to it through legislation. *See Mazza v. Dep't of Transp.*, 692 A.2d 251, 252 (Pa.Cmwlth.1997) (en banc), *appeal denied*, 551 Pa. 172, 709 A.2d 887 (1998). And, while it is fair to say that DCNR is a cabinet-level agency vested with the authority to protect our State park and forest lands consistent with the Environmental Rights Amendment, it does not exercise that authority to the exclusion of the General Assembly, the Governor, or even this Court. As noted by the Supreme Court plurality in *Robinson Township*, "the Commonwealth" is the trustee under Article I, Section 27, not DCNR.[40] *Robinson Twp.*, 83 A.3d at 957.

We also note the Lease Fund is a special fund created by the Lease Fund Act, not by the Pennsylvania Constitution. Indeed, the Lease Fund pre-existed the Environmental Rights Amendment by roughly fifteen years. Just as the General Assembly had the authority to vest within DCNR the discretion to use monies in the Lease Fund consistent with the purposes of the Lease Fund Act, we do not view it any less constitutional for the General Assembly, through Section 1602–E, to reassert some control over the use of funds within that special fund. How the General Assembly exercises that control, however, is a different question. The General Assembly's powers, like the other branches of government, are tempered by the Declaration of Rights in the Pennsylvania Constitution, which includes the Environmental Rights Amendment. *See Robinson Twp.*, 83 A.3d at 947–48.

This brings us then to the plain language of Section 1602–E:

> Notwithstanding any other provision of law and except as provided in section

---

**40.** We address later in Part IV(E) of this opinion how the General Assembly and Governor, through legislation, have vested certain decision-making authority exclusively within the purview of DCNR.

1603–E, no money in the [Lease] [F]und from royalties may be expended unless appropriated or transferred to the General Fund by the General Assembly from the [Lease] [F]und. In making appropriations, the General Assembly shall consider the adoption of an allocation to municipalities impacted by a Marcellus well.

Contrary to PEDF's claims, this language does not in any way abrogate the authority conferred on DCNR in the CNRA to choose whether to enter into leases of State land for oil and natural gas extraction. And, while the language removes *royalty* revenue from the standing appropriation to DCNR under Section 3 of the Lease Fund Act, the standing appropriation remains for all *rent* revenue, inclusive of rental revenue in the form of bonus payments, in the Lease Fund.

Based on the plain language, then, PEDF has not convinced this Court that Section 1602–E of the Fiscal Code is clearly, palpably, and plainly unconstitutional. The decision by the General Assembly, reflected in the statutory language, to vest in itself the power to appropriate certain monies in the Lease Fund does not by itself infringe upon the rights afforded the people of this Commonwealth under the Environmental Rights Amendment. Nor does the decision reflect a failure by the General Assembly to act consistent with its trustee obligations under Article I, Section 27. We, therefore, will deny PEDF's application for summary relief with respect to its constitutional challenge to Section 1602–E and grant Commonwealth Respondents' cross-application.

### 2. Section 1603–E

As noted above, subject to the availability of money in the Lease Fund, Section 1603–E appropriates "up to $50,000,000" in royalty monies from the Lease Fund to DCNR annually to carry out the purposes of the Lease Fund. The section requires DCNR to give preference in the use of those dollars to the operation and maintenance of State parks and forests. PEDF contends that Section 1603–E violates the Environmental Rights Amendment in the following respects:

> Section 1603–E of the Fiscal Code violates Article I § 27 by arbitrarily limiting the royalties available to DCNR from the … Lease Fund to $50,000,000 without any fiduciary analysis of the financial needs of DCNR to meet its statutory and constitutional responsibilities to conserve and maintain the State Parks and Forest lands, and to protect the rights and benefits of the people of the Commonwealth to those lands.

(Pet'r's Br. at 93–94.) In essence, PEDF's constitutional challenge to this section of the Fiscal Code is based on the contention that by limiting DCNR's funding from the royalties in the Lease Fund to "up to $50,000,000," the General Assembly is failing to fund DCNR's mission adequately under the Environmental Rights Amendment.

Whether this Court can or should evaluate the adequacy of legislatively-established funding for a Commonwealth agency is a complex inquiry, implicating concerns over whether doing so would run afoul of the separation of powers and threaten respect and cooperation between the coordinate branches of government. There have been times where the judiciary has been asked to adjudicate disputes over legislatively-established funding, with mixed results.

In *Commonwealth ex rel. Carroll v. Tate*, 442 Pa. 45, 274 A.2d 193 (1971), the president judge of the court of common pleas of Philadelphia County brought a mandamus action to compel the Mayor and City Council of Philadelphia to appropriate

additional funds to the court, which the president judge maintained were necessary for the operation of the court. The trial court, acting through a Superior Court judge specially appointed to preside over the action, ordered the defendants to appropriate an additional $2.5 million to the court. An appeal to this Court followed, at which time the Supreme Court assumed plenary jurisdiction.

The Supreme Court affirmed the trial court's decision. In so doing, the Supreme Court explored the power of the judiciary to enter into the inquiry of adequate funding of the courts by the executive and legislative branches. In justifying its jurisdiction, the Supreme Court opined:

It is a basic precept of our Constitutional form of Republican Government that the Judiciary is an independent and co-equal Branch of Government, along with the Executive and Legislative Branches....

Because of the basic functions and inherent powers of the three co-equal Branches of Government, the co-equal independent Judiciary must possess rights and powers co-equal with its functions and duties, including the right and power to protect itself against any impairment thereof.

Expressed in other words, the Judiciary Must possess the inherent power to determine and compel payment of those sums of money which are reasonable and necessary to carry out its mandated responsibilities, and its powers and duties to administer Justice, if it is to be in reality a co-equal, independent Branch of our Government. This principle has long been recognized, not only in this Commonwealth but also throughout our Nation.

The very genius of our tripartite Government is based upon the proper exercise of their respective powers together with harmonious cooperation between the three independent Branches. However, if this cooperation breaks down, the Judiciary must exercise its inherent power to preserve the efficient and expeditious administration of Justice and protect it from being impaired or destroyed.

*Tate*, 274 A.2d at 196–97 (citations omitted). The Court also set forth the limits of its power in such cases:

The Court does not have Unlimited power to obtain from the City whatever sums it would like or believes it needs for its proper functioning or adequate administration. Its wants and needs must be proved by it to be "reasonably necessary" for its proper functioning and administration, and this is always subject to Court review.

... A Legislature has the power of life and death over all the Courts and over the entire Judicial system. Unless the Legislature can be compelled by the Courts to provide the money which is reasonably necessary for the proper functioning and administration of the Courts, our entire Judicial system could be extirpated, and the Legislature could make a mockery of our form of Government with its three co-equal branches-the Executive, the Legislative and the Judicial.

*Id.* at 199.

Since *Tate*, the courts have on several occasions been called to evaluate the funding decisions of legislative bodies with respect to the judiciary and have found the issue before them to be justiciable. In *Kremer v. Barbieri*, 48 Pa.Cmwlth. 557, 411 A.2d 558 (1980) (en banc) (per curiam), this Court entertained a challenge to the adequacy of judicial compensation, as provided for under Article V, Section 16(a) of

the Pennsylvania Constitution.[41] The Court concluded, however, that the plaintiffs failed to meet the heavy burden of proof with respect to the alleged constitutional inadequacy of judicial salaries:

> To obtain such relief, we believe that they would have had to show not just that their compensation is inadequate in the terms in which they have described it *but inadequate because it impairs the proper functioning of the judicial system.* This they have not done.

*Kremer,* 411 A.2d at 567 (emphasis added). In *Goodheart v. Casey,* 521 Pa. 316, 555 A.2d 1210 (1989), a divided Supreme Court affirmed a decision of this Court, ruling unconstitutional certain legislative changes to the state pension system that led to reduced pension benefits to judges who entered service in the court of common pleas after March 1, 1974, when compared to their counterparts on the same court who entered service before that date.

In a series of decisions, beginning with *County of Allegheny v. Commonwealth,* 517 Pa. 65, 534 A.2d 760 (1987), the Pennsylvania Supreme Court exercised jurisdiction over a challenge to the funding scheme that the General Assembly established, requiring counties to fund the local judicial system. In those cases, the plaintiffs contended that legislation violated Article V, Section 1 of the Pennsylvania Constitution, which provides for a unified judicial system. This Court had dismissed the action originally, holding that the case involved a nonjusticiable question of financing governmental operations, which fell within the exclusive province of the General Assembly, which under our Constitution has the power of the purse. The Supreme Court, however, disagreed, noting that although the General Assembly has the constitutional authority to control state finances, its authority is subject to constitutional limitations:

> Essentially, this is a case in which the Commonwealth Court was called upon to determine, by way of familiar principles of constitutional and statutory construction whether the General Assembly has imposed any obligations on the County to fund Pennsylvania's court system, and if it has, whether these obligations are constitutional. Since, as we have seen, the financing of state institutions has not been incontrovertibly and in all cases relegated to the direction and control of the General Assembly, and since the rights of the parties were able to be determined by construction of the relevant statutes and constitutional provisions, it was error for the Commonwealth Court to hold that the case is non-justiciable and to enter judgment upon preliminary objections.

*Cnty. of Allegheny,* 534 A.2d at 762. On the merits, the Supreme Court concluded that the statutory scheme for county funding of the common pleas courts violated the constitutional provision requiring a single unified judicial system. The Supreme Court, however, stayed its ruling to give the General Assembly the opportunity to enact a replacement scheme for funding that would pass constitutional muster. *Id.* at 765.

---

41. Article V, Section 16(a) provides:
    Justices, judges and justices of the peace shall be compensated by the Commonwealth as provided by law. Their compensation shall not be diminished during their terms of office, unless by law applying generally to all salaried officers of the Commonwealth.

In *Glancey v. Casey,* 447 Pa. 77, 288 A.2d 812 (1972), the Pennsylvania Supreme Court held that in order to insure the independence of the judicial branch, the General Assembly had the obligation to provide for adequate compensation commensurate with the duties and responsibilities of office.

Nine years passed without the General Assembly's enactment of a replacement system. At the request of the Pennsylvania State Association of County Commissioners and several counties, the Supreme Court ordered the General Assembly to comply with its prior decision in *County of Allegheny* and enact a funding scheme for the courts by January 1, 1998, and appointed a senior judge to study the state's judicial system and prepare recommendations for the Supreme Court for the implementation of a unified judicial system. *Pa. State Ass'n of Cnty. Comm'rs v. Commonwealth*, 545 Pa. 324, 681 A.2d 699 (1996) (*PSACC I*).

More recently, in 2012, the Pennsylvania Supreme Court was again asked to address the General Assembly's compliance with its decision in *County of Allegheny* and subsequent decision in *PSACC I*. This time, however, the Supreme Court refused to take further steps to direct the General Assembly on the issue of funding a unified judicial system. Among the reasons cited was the following:

As we have recognized, the problems presented in *Allegheny County* [ ], *PSACC* [*I* ], and the current litigation, arise out of the intrinsic difficulties of maintaining the delicate balance of a tripartite system of government, where the legislative branch controls the purse and the Judiciary, an independent branch, is dependent on the Legislature for funding. At this point in time, there are unique challenges that all branches of the Commonwealth's government face as a result of a continuing economic crisis and concomitantly diminished revenues. In this context, we believe that the better course is for further enhancements of the unified judicial system to be a product of inter-branch cooperation.

*Pa. State Ass'n of Cnty. Comm'rs v. Commonwealth*, 617 Pa. 231, 52 A.3d 1213, 1232–33 (2012) (*PSACC II* ) (footnote omitted).

But, whereas the Pennsylvania Supreme Court has been willing to involve itself in the General Assembly's fiscal decisions when they impact the judiciary, relying heavily on the need to preserve its independence, this Court has been cautious in intervening in funding disputes when it comes to matters outside the sphere of the judicial branch. In *Marrero v. Commonwealth*, 709 A.2d 956 (Pa.Cmwlth.1998) (en banc), *aff'd*, 559 Pa. 14, 739 A.2d 110 (1999), the petitioners, advocates for the City of Philadelphia School District, brought a declaratory judgment action in this Court's original jurisdiction, alleging that the General Assembly failed to provide adequate funding for the Philadelphia schools in violation of Article III, Section 14 of the Pennsylvania Constitution, which provides:

The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth.

The Commonwealth respondents filed preliminary objections. One of the preliminary objections challenged this Court's ability to grant the petitioners relief. The Commonwealth respondents contended that the funding of the public school system is a matter exclusively committed to the General Assembly and, thus, is not subject to judicial review under the separation of powers or political question doctrines.

This Court sustained the Commonwealth's preliminary objection. In so doing, we noted the Pennsylvania Supreme Court's decision in *Sweeney v. Tucker*, 473 Pa. 493, 375 A.2d 698 (1977), which held that the courts may not review challenges to the General Assembly's exercise of a power when the Pennsylvania Constitution

confers that power *exclusively* on the General Assembly. *Marrero*, 709 A.2d at 960. We further noted that Article III, Section 14 expressly places the responsibility for maintenance and support of public education in the hands of the General Assembly and thus found ourselves incapable of granting the petitioners the requested relief:

> Thus, this court will not inquire into the reason, wisdom, or expediency of the legislative policy with regard to education, nor any matters relating to legislative determinations of school policy or the scope of educational activity.... [T]his court is ... unable to judicially define what constitutes an "adequate" education or what funds are "adequate" to support such a program. These are matters which are exclusively within the purview of the General Assembly's powers, and they are not subject to intervention by the judicial branch of our government.

*Id.* at 965–66 (citation omitted).

In *Mental Health Association in Pennsylvania v. Corbett*, 54 A.3d 100 (Pa. Cmwlth.2012), various nonprofit entities that advocate and lobby on behalf of persons with mental health issues and intellectual disabilities filed an action in our original jurisdiction in response to the Governor's proposed budget, asking this Court to enter declaratory and injunctive relief based on the alleged inadequacy of funding to the Department of Public Welfare [42] for mental health and intellectual disability services in the Commonwealth. The Commonwealth respondents filed preliminary objections, arguing that the petitioners' lawsuit violated the separation of powers by asking this Court to review political questions reserved for the executive and legislative branches. A three-judge panel of this Court agreed and dismissed the petition for review:

> [T]he Governor was well within his constitutionally-granted powers not to increase or direct the increase of funding sought by DPW, and to send the proposed budget to the General Assembly on February 12, 2012....
>
> ... [I]t is no secret that the Commonwealth is facing an enormous financial crisis, which has resulted in deep cuts by every Commonwealth department and agency, and by the General Assembly and the Judiciary. Accordingly, the Governor has proposed a cut in DPW's funding, and a shift of monies appropriated for MH/ID services into the HSDF Block Grant for MH/ID and other community-based services distribution. It is the General Assembly, however, that ultimately determines how statutory budget obligations will be satisfied, and whether the MH/ID Act will be amended. There is no authority for this Court to insert itself into that process.

*Mental Health Ass'n in Pa.*, 54 A.3d at 105; *see also Phila. Dep't of Human Servs. v. Dep't of Pub. Welfare*, 941 A.2d 766 (Pa.Cmwlth.2008) (holding that county human services agency was not entitled to administrative hearing over tentative budget proposals and allocations).

In *Finn v. Rendell*, 990 A.2d 100 (Pa. Cmwlth.2010), a single-judge opinion,[43] this Court dismissed a petition for review in our original jurisdiction, wherein the County Commissioners of Montour County sought an order compelling the Commonwealth to provide the funds necessary to

---

42. Effective November 24, 2014, the Department of Public Welfare's name changed to the Department of Human Services. *See* Act of September 24, 2014, P.L. 2458.

43. As a single-judge opinion, we cite *Finn* for its persuasive value pursuant to Section 414(b) of the Court's Internal Operating Procedures.

reimburse the county for costs incurred in funding its full-time district attorney and to provide adequate funding going forward. Among the reasons the Court cited was the doctrine of separation of powers, pointing to the General Assembly's taxing and spending powers under Article II, Section 1 of the Pennsylvania Constitution,[44] and the speech and debate clause in Article II, Section 15.[45] *Finn*, 990 A.2d at 106.

With this background, we turn to the question of whether PEDF's challenge to the adequacy the funding provided to DCNR in Section 1603–E of the Fiscal Code is justiciable. We are mindful that the constitutional imperative to conserve and maintain our public natural resources does not wax and wane with our cyclical economy. But, except in extreme cases where the independence of the judicial branch has been threatened, the above precedent shows a reluctance in, if not an outright refusal by, this Court to second guess the amounts of the General Assembly's appropriations to Commonwealth agencies. Because DCNR has at least a statutory obligation to maintain and conserve State lands held in trust under the Environmental Rights Amendment, PEDF would argue that judicial review is warranted here, if only to ensure that the General Assembly's appropriations to DCNR are not so inadequate that it effectively defunds our State parks and forests.

We need not, however, reach the question of whether the adequacy of funding to DCNR to meet its statutorily-delegated duties under the Environmental Rights Amendment is justiciable. The only standard for adequate funding inquiries adopted by the Pennsylvania Supreme Court inquires as to whether the amount funded is so inadequate that it impairs the proper functioning of the judiciary, or in this case DCNR. If we were to apply that standard here, PEDF has presented no evidence that the current funding appropriated to DCNR from all sources is inadequate—*i.e.*, that the funding is so deficient that DCNR cannot conserve and maintain our State natural resources. We, therefore, will deny PEDF's application for summary relief with respect to its constitutional challenge to Section 1603–E and grant Commonwealth Respondents' cross-application.

### D. Environmental Rights Amendment Challenges to General Assembly Transfers/Appropriations From the Lease Fund

We concluded above that the General Assembly acted within its constitutional authority in enacting Section 1602–E of the Fiscal Code above, reinvesting in it the power to appropriate royalty monies within the Lease Fund. Passing legislation, including Act 13, which appropriates those monies is also a valid exercise of the General Assembly's constitutional power. PEDF, however, contends that in exercising that power, the General Assembly has violated Article I, Section 27, which is a constitutional limitation on how the Commonwealth, as trustee, may

---

**44.** Article II, Section 1 of the Pennsylvania Constitution provides: "The legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives."

**45.** Article II, Section 15 of the Pennsylvania Constitution provides:

The members of the General Assembly shall in all cases, except treason, felony, violation of their oath of office, and breach or surety of the peace, be privileged from arrest during their attendance at the sessions of their respective Houses and in going to and returning from the same; *and for any speech or debate in either House they shall not be questioned in any other place.* (Emphasis added.)

spend revenue recognized from the leasing of State land for oil and natural gas development. PEDF contends that those monies must be committed to furthering the purposes, rights, and protections afforded under the Environmental Rights Amendment. "[R]egardless of the extent to which the political branches are responsible for budgetary matters, they are not permitted to enact budget-related legislation that violates the constitutional rights of Pennsylvania citizens." *Hosp. & Healthsystem Ass'n of Pa. v. Commonwealth,* 621 Pa. 260, 77 A.3d 587, 598 (2013) (*HHAP*). In addressing this contention, we must determine whether there is such a constitutional constraint and, if there is, whether the uses to which the General Assembly has directed Lease Fund dollars violate that constraint.

PEDF's constitutional challenge to the General Assembly's appropriation and transfer of monies out of the Lease Fund implicates the second and third clauses of the Environmental Rights Amendment, which create a public trust in favor of the people. As trustee, the Commonwealth "is a fiduciary obligated to comply with the terms of the trust and with standards governing a fiduciary's conduct." *Robinson Twp.,* 83 A.3d at 957. Those fiduciary standards have been summarized by the Pennsylvania Superior Court as follows:

"A trust is a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person...." The settled law in Pennsylvania is that "the pole star in every trust ... is the settlor's ... intent and that intent must prevail." The settlor's intent may be divined by considering the trust document as a whole.

. . .

"The primary duty of a trustee is the preservation of the assets of the trust and the safety of the trust principal." *In re Estate of Warden,* 2 A.3d 565, 572 (Pa.Super.2010) (first three alterations in original) (citations omitted) (quoting *In re Trust of Hirt,* 832 A.2d 438, 447–48 (Pa.Super.2003); *Estate of Pew,* 440 Pa.Super. 195, 655 A.2d 521, 533 (1994)).

Turning to the Environmental Rights Amendment, it is evident that in ratifying the Environmental Rights Amendment the citizens of this Commonwealth intended to place Pennsylvania's "public natural resources" in trust and to impose a duty on the Commonwealth, as trustee, to *"conserve and maintain* them for the benefit of all the people." Pa. Const. art. I, § 27 (emphasis added). The only guidance we have on the meaning of the phrase "public natural resources" is from the *Robinson Township* plurality:

The drafters ... left unqualified the phrase public natural resources, suggesting that the term fairly implicates relatively broad aspects of the environment, and is amenable to change over time to conform, for example, with the development of related legal and societal concerns. At present, the concept of public natural resources includes not only state-owned lands, waterways, and mineral reserves, but also resources that implicate the public interest, such as ambient air, surface and ground water, wild flora, and fauna (including fish) that are outside the scope of purely private property.

The legislative history of the amendment supports this plain interpretation. In its original draft, the second clause of the proposed Environmental Rights Amendment included an enumeration of the public natural resources to be protected. The resources named were "the air, waters, fish, wildlife, and the public

lands and property of the Commonwealth...." But, after members of the General Assembly expressed disquietude that the enumeration of resources would be interpreted "to limit, rather than expand, [the] basic concept" of public natural resources, Section 27 was amended and subsequently adopted in its existing, unrestricted, form. The drafters seemingly signaled an intent that the concept of public natural resources would be flexible to capture the full array of resources implicating the public interest, as these may be defined by statute or at common law.

*Robinson Twp.*, 83 A.3d at 955 (last two alterations in original) (citations omitted). With respect to the duty to conserve and maintain, the plurality continued:

> The plain meaning of the terms conserve and maintain implicates a duty to prevent and remedy the degradation, diminution, or depletion of our public natural resources. As a fiduciary, the Commonwealth has a duty to act toward the corpus of the trust—the public natural resources—with prudence, loyalty, and impartiality.

*Id.* at 957.

Although the Environmental Rights Amendment places an affirmative duty on the Commonwealth to "prevent and remedy the degradation, diminution, or depletion of our public natural resources"—*i.e.*, to conserve and maintain, the Environmental Rights Amendment does not also expressly command that all revenues derived from the sale or leasing of the Commonwealth's natural resources must be funneled to those purposes and those purposes only.[46] In the absence of an express direction to the contrary, so long as the Commonwealth is fulfilling its Article I, Section 27 obligations, the source of the funding appropriated to meet those obligations seems to us to be a matter of discretion vested in the General Assembly under Article II, Section 1; Article III, Section 24;[47] and Article VIII, Section 13[48] of the Pennsylvania Constitution.

■ The only constraint we see on the use of monies derived from the sale or leasing of public natural resources under Article I, Section 27 is the general requirement that the monies be used "for the benefit of all the people." The public benefit to which those monies are put lies within the discretion of the General Assembly. Because of this conclusion, we reject PEDF's contention that the Lease Fund, created by statute, is a trust fund. Absent any constitutional protection, the Lease Fund is a special fund. As our Supreme Court recognized in *HHAP*, the General Assembly "retain[s] authority to

---

**46.** Where the drafters of the Pennsylvania Constitution intended to dedicate a tranche of money to a particular purpose, they did so expressly. *See* Pa. Const. art. VIII, § 11(a) (relating to Motor Licensing Fund); *id.* § 16 (relating to Land and Water Conservation and Reclamation Fund).

**47.** Article III, Section 24 of the Pennsylvania Constitution, titled "Paying Out Public Moneys", provides: "No money shall be paid out of the treasury, except on appropriations made by law and on warrant issued by the proper officers; but cash refunds of taxes, licenses, fees and other charges paid or collected, but not legally due, may be paid, as

provided by law, without appropriation from the fund into which they were paid on warrant of the proper officer."

**48.** Article VIII, Section 13 of the Pennsylvania Constitution, titled "Appropriations", provides:

(a) Operating budget appropriations made by the General Assembly shall not exceed the actual and estimated revenues and surplus available in the same fiscal year.

(b) The General Assembly shall adopt a capital budget for the ensuing fiscal year.

control the fate of special funds in order to serve the changing needs of the government." *HHAP*, 77 A.3d at 604.[49] Concluding that there is no constitutional mandate that monies derived from the leasing of State lands for oil and natural gas development be reinvested into the conservation and maintenance of the Commonwealth's public natural resources, we need not consider, for purposes of a constitutional analysis, the various uses for which the General Assembly has appropriated those funds, which on their face appear to be uses that benefit all of the people of the Commonwealth. We, therefore, will deny PEDF's application for summary relief with respect to its constitutional challenge to the transfers/appropriations from the Lease Fund and grant Commonwealth Respondents' cross-application on this challenge.

## E.  Future Leasing

As noted above, we will not consider PEDF's challenges to the legality of the 2008 Lease Sale, January 2010 Lease Sale, or the Anadarko Lease Sale due to the absence of indispensable parties. Moreover, we do not have before us a challenge to a proposed sale, as the record does not show that a final decision to lease additional State lands for non-surface disturbance leasing, as authorized in the Corbett Executive Order, has been made. Nonetheless, the Corbett Executive Order, coupled with the amendment to Section 1605–E of the Fiscal Code, authorizing the transfer of $95 million from the Lease Fund to the General Fund in FY 2014–2015, strongly suggests that further leasing is, or will be, under consideration. One would have to ignore the history of the Commonwealth's leasing activities during the Marcellus Shale era to conclude otherwise. Accordingly, we will address an issue raised by the Commonwealth Respondents in their cross-motions for summary relief relating to this decision-making process.[50]

It is important here to note that *Robinson Township* involved efforts by the Commonwealth to regulate by legislation oil and natural gas development throughout the Commonwealth, and not just on Commonwealth-owned lands. Thus, it was necessary for the Supreme Court to strike a reasonable balance between the rights and

---

49. In *HHAP*, the Pennsylvania Supreme Court held that the Medical Care Availability and Reduction of Error (MCARE) Fund, although a special fund created by statute, operated in the nature of a trust fund for the benefit of the health care providers. It reached this conclusion because the law actually compelled health care providers to pay into the fund, with the promise that the monies would be used to satisfy professional liability judgments against them. Here, the citizens of the Commonwealth are not compelled to pay their personal property into the fund with a promised benefit. Although the Environmental Rights Amendment places their common property—the Commonwealth's natural resources—in the hands of the Commonwealth as trustee, the promise in return is only that the Commonwealth would conserve and maintain that property for their collective benefit.

50. The concurring and dissenting opinion states that until there is a "disagreement between the Governor and DCNR over leasing," our discussion in this portion of the opinion is premature, at best. We disagree. Given the fact that cabinet-level officials serve at the pleasure of the Governor, we do not envision a situation where the Governor would ever be forced into Court to resolve a conflict with one of his appointees. There is a more obvious, non-judicial remedy available to the Governor in that situation. The disagreement we address in this portion of the opinion, instead, is between PEDF and the Commonwealth Respondents as to who has the authority to make leasing decisions. We can envision no additional facts or context that would elucidate this pure question of law. Moreover, as noted above, legislative actions relating to Commonwealth FY 2014–2015, when viewed through the prism of history, provide sufficient indicia of an actual controversy.

duties conferred to all Pennsylvanians under Article I, Section 27, and the inherent right of our citizens to the fair use, enjoyment, and, indeed, profit from their real property. Here no such balancing is necessary, because what is at issue here is revenue generated not from natural gas development on private property, but from the leasing of State lands and disposition of state natural resources held in trust by the Commonwealth for an express purpose—*i.e.*, conservation and maintenance. The decision to use State lands for revenue-generating activities and development lies exclusively within the Commonwealth's control. *Cf. Belden & Blake Corp. v. Dep't of Conservation & Natural Res.*, 600 Pa. 559, 969 A.2d 528 (2009) (addressing access issues of owner of subsurface oil and gas rights where Commonwealth, as trustee, holds surface rights).

Moreover, there is neither a mandate within nor an expectation created by the Environmental Rights Amendment that state-owned lands or natural resources (*e.g.*, timber, coal, oil, and natural gas) would be leased or sold for reasonable economic development. Nonetheless, even the plurality in *Robinson Township* recognized that "development promoting the economic well-being of the citizenry obviously is a legitimate state interest." *Robinson Twp.*, 83 A.3d at 954. The plurality continued: "[W]e do not perceive Section 27 as expressing the intent of either the unanimous legislative sponsors or the ratifying voters … to derail development leading to an increase in the general

welfare, convenience, and prosperity of the people." *Id.* If anything, when environmental concerns of development are juxtaposed with economic benefits of development, the Environmental Rights Amendment is a thumb on the scale, giving greater weight to the environmental concerns in the decision-making process. A determination as to whether sales or leases of state-owned lands or natural resources are consistent with the Commonwealth's obligations under Article I, Section 27, must be made on a case-by-case basis.

■ The General Assembly set forth "legislative findings" [51] in the 2014 Fiscal Code Amendments, including a finding that "[r]evenue from the leasing of State land to extract natural gas is necessary to obtain the revenue necessary to effectuate" the 2014 GAA. Section 1601.1–E of the Fiscal Code. The General Assembly also found that, "notwithstanding any law to the contrary, it is in the best interest of the Commonwealth to lease oil and gas rights," if two criteria are satisfied. *Id.* The first criteria is if DCNR, "in consultation with the Governor, continues strong and effective lease protections, best management practices and ongoing monitoring programs on the impact of gas operations." *Id.* The second criteria is if DCNR "maintains a balance of money in the [Lease] [F]und to carry out [DCNR's] statutory obligation to protect State forest and park land and other environmental activities." *Id.*

---

**51.** Legislative findings set forth in statute may be helpful in divining legislative intent when construing the particular law. *See* 1 Pa.C.S. § 1921 (providing that "object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly"). Those findings, however, are not unassailable. In *Commonwealth v. Williams*, 574 Pa. 487, 832 A.2d 962 (2003), the Pennsylvania Supreme Court relied, in part, on codified legislative findings when it determined that the General Assembly's intent in passing what is commonly known as Megan's Law II, 42 Pa.C.S. §§ 9791–9799.1, was to promote public safety and not to punish. It did so, however, recognizing an absence of "competent and credible evidence undermining the relevant legislative findings." *Williams*, 832 A.2d at 986.

The legislative findings within the 2014 Fiscal Code Amendments provide insight into the General Assembly's decision to transfer monies in the Lease Fund to the General Fund and support the General Assembly's view that DCNR should enter into additional leases of State land for oil and natural gas extraction. The criteria set forth therein, however, are not the criteria for assessing the constitutionality of future sales and leases, nor is the General Assembly's finding that it is in the Commonwealth's best interest to lease oil and gas rights binding on this Court or executive branch decision-makers. We are not required to defer to any of the General Assembly's codified legal analyses and conclusions disguised as legislative findings. It is within the province of the judiciary to determine whether particular legislative or executive action complies with existing law and, even more important, the Pennsylvania Constitution.

█ As to who has authority over leasing decisions, Commonwealth Respondents contend that the Environmental Rights Amendment does not place the sole authority over leasing decisions within DCNR. "Section 27," they contend, "does not impose a duty on the Governor to follow slavishly recommendations of the head of DCNR or his staff when making policy decisions that might have an impact on public natural resources." (Cmwlth. Respondents' Br. at 33–34.) In essence, Commonwealth Respondents contend that because the DCNR Secretary serves at the pleasure of the Governor and as a part of the executive branch, the Governor may override any and all decisions made by the DCNR Secretary.

We recognize the Governor's constitutional role as Chief Executive. Nonetheless, his duty as such requires him to "take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. One of those laws is the CNRA, which vests within DCNR, not the Governor, exclusive authority to make and execute contracts or leases in the name of the Commonwealth for the extraction of oil and natural gas on State lands and to determine whether doing so is in the best interest of the Commonwealth. Section 302(a)(6) of the CNRA. The Court recognizes that appointed agency heads serve at the pleasure of the Governor and are, therefore, expected to take their lead from the Governor's office in terms of policy. But, the sale or lease of our Commonwealth's natural resources implicates not just policy, but constitutional rights and duties as well. *Robinson Twp.*, 83 A.3d at 981 ("[T]he Constitution constrains this Court not to be swayed by counter-policy arguments where the constitutional command is clear.") As appointed officers of the Commonwealth, vested by law with the duty to protect and preserve our natural resources, officials within DCNR serve at the pleasure of the Governor. But, so long as they serve, they serve the people of this Commonwealth.[52] And, the people of Pennsylvania

---

**52.** The modern administrative agency is subject to checks and balances from all three branches of government. It derives its existence and authority from the legislature. Its decisions are subject to review by the judiciary. And, the executive branch exercises its oversight through the power to appoint and remove. Justice Papadakos explained this well:

Modern administrative agencies, on both the state and Federal levels, that have developed since before the New Deal usually combine legislative, executive and judicial functions under one roof. Such agencies are often collectively referred to as the "Fourth Branch" of government. *See*, Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch*, 84 Columbia L.R. 573 (1984). The relationship of the fourth branch to the other three branches is not spelled out in any detail in

are entitled to expect that those officials will "support, obey and defend" Article I, Section 27 of the Pennsylvania Constitution in the discharge of their powers and duties under the CNRA with fidelity, even when faced with overwhelming political pressure, perhaps from the Governor, to act against their better judgment. *See* Pa. Const. art. VI, § 3 (Oath of Office). This is not to say that the Governor, as the Chief Executive, and the General Assembly are precluded from attempting to influence DCNR's leasing decisions. Based on the CNRA, however, the ultimate decision lies exclusively with DCNR, and DCNR, therefore, is accountable for making the decision to lease and, if challenged, justifying it.

To the extent additional leasing of State lands is under consideration, the Court believes that DCNR is positioned to act consistent with its Article I, Section 27 duties and obligations. Those duties and obligations extend beyond imposing lease terms like those described by the General Assembly in Section 1601.1–E of the Fiscal Code. These types of lease provisions are certainly critical, as they, like the web of state and federal regulations that govern the manner by which natural gas may be extracted, are designed to reduce the risk of harm to the environment and impose remediation obligations on the lessee in the event of damage to our Commonwealth's natural resources. As it did in the prior lease sales during the Marcellus Shale era, however, DCNR must also consider whether even entering into further leasing would be in the best interests of the Commonwealth *and* consistent with the rights, duties, and obligations embodied in the Environmental Rights Amendment. Should DCNR choose to enter into further leases of state natural resources, it must provide adequate notice of that decision to the public. *See In re Condemnation by the Commonwealth, Dep't of Transp., of Right of Way, for Legislative Route 201, Section 5R/W*, 22 Pa.Cmwlth. 440, 349 A.2d 819, 822–23 (1975) (en banc).

## V.  CONCLUSION

For the reasons set forth above, PEDF has failed to meet its burden with respect to its constitutional challenges to Sections 1602–E and 1603–E of the Fiscal Code. Summary relief will, therefore, be granted in favor of Commonwealth Respondents and against PEDF on those challenges. PEDF's constitutional challenges to the 2008 Lease Sale, January 2010 Lease Sale, and the Anadarko Lease Sale are dismissed due to lack of subject matter jurisdiction because of the absence of indispensable parties. As to PEDF's claim

the Federal Constitution or in our own Pennsylvania Constitution....

... Nonetheless, because of the inherent concept of separation of powers, and the path of historical development, some bright lines can be established. An administrative agency that carries out public business directly affecting or regulating individual citizens must have some significant official relationship, however tenuous in certain respects, with each of the three constitutional branches. Each of those three branches must have some degree of oversight function in order to pass constitutional muster.

...

Executive oversight has occurred most frequently in the forms of appointment and removal. In spite of the growth of a professional bureaucracy and civil service protection, it is clear that a President or a governor can hire, or fire, top level policy making administrators. Even with respect to so-called "independent" agencies or commissions, the executive branch has some input and authority because of the right to appoint, which is usually coupled to a limited right of removal.

*Commonwealth v. Sessoms*, 516 Pa. 365, 532 A.2d 775, 784 (1987) (Papadakos, J., concurring).

that the Lease Fund is a "trust fund" and its contents must therefore only be used to advance the purposes of the Environmental Rights Amendment, PEDF's application for summary relief will be denied and Commonwealth Respondents' cross-application will be granted.

Finally, because we conclude that under the CNRA, DCNR has the exclusive statutory authority to determine whether to sell or lease the Commonwealth's natural resources for oil and natural gas extraction, Commonwealth Respondents' application for summary relief, asking us to hold that the Governor may override DCNR's decisions under the CNRA, will be denied. As to all other claims subject to the parties' cross-applications for summary relief, the applications will be denied.

### ORDER

AND NOW, this 7th day of January, 2015, upon consideration of the cross-applications for summary relief of Petitioner Pennsylvania Environmental Defense Foundation (PEDF) and Commonwealth of Pennsylvania and Governor Thomas W. Corbett, Jr., in his official capacity (Commonwealth Respondents), and for the reasons set forth in the accompanying opinion, it is hereby ORDERED:

1. With respect to PEDF's request for a declaratory judgment that Sections 1602–E and 1603–E of the Fiscal Code, Act of April 9, 1929, P.L. 343, *as amended,* 72 P.S. §§ 1602–E, 1603–E, are unconstitutional, PEDF's application for summary relief is DENIED and Commonwealth Respondents' application for summary relief is GRANTED.

2. PEDF's constitutional challenges to past leases of State lands for oil and natural gas extraction are DISMISSED due to lack of subject matter jurisdiction because of the absence of indispensable parties.

3. With respect to PEDF's request for a declaratory judgment that the Oil and Gas Lease Fund is a "trust fund" and that the General Assembly may only appropriate the monies therein to advance the purposes of Article I, Section 27 of the Pennsylvania Constitution, PEDF's application for summary relief is DENIED and Commonwealth Respondents' application for summary relief is GRANTED.

4. With respect to Commonwealth Respondents' request, in its application for summary relief, for a declaration that the Governor may override decisions of the Department of Conservation and Natural Resources under Section 302(a)(6) of the Conservation and Natural Resources Act, Act of June 28, 1995, P.L. 89, 71 P.S. § 1340.302(a)(6), Commonwealth Respondents' application for summary relief is DENIED.

5. As to all other claims subject to the parties' cross-applications for summary relief, the applications are DENIED.

### CONCURRING & DISSENTING OPINION BY Judge COHN JUBELIRER.

I commend the Majority for a thorough and thoughtful opinion. While I join Parts I, II, III, and IV(A–D) of the Majority opinion, I respectfully dissent as to Part IV(E) of the opinion.

Although there has been no final decision regarding whether to lease additional state lands for oil and natural gas development, the Majority nonetheless addresses this potentiality in Part IV(E) of the opinion. Courts should resolve actual disputes when they are presented, not give advisory opinions. Judicial constraint is particularly important when courts address the constitutional authority for decisions made by the other elected branches of our government. The Majority's concern about "the history of the Commonwealth's leasing activities during the Marcellus Shale era,"

does not create the necessary controversy to justify a declaratory judgment. *Pennsylvania Environmental Defense Foundation v. Commonwealth*, 108 A.3d 140, 169–70, 2015 WL 79773 (Pa.Cmwlth.2015) (*PEDF*). The fact that Commonwealth Respondents, including the Governor, have asked this Court to address the issue of future leasing by filing their cross-motion for summary judgment also does not create an actual controversy.

This Court previously stated that "[a] declaratory judgment may be obtained only where there is a real controversy. . . ." *Mazur v. Washington County Redevelopment Authority*, 954 A.2d 50, 52–53 (Pa.Cmwlth.2008). Further, "[i]t is well established that declaratory judgment relief requires the presence of antagonistic claims indicating imminent and inevitable litigation coupled with a clear manifestation that the declaration will be of practical help in ending the controversy." *Citizen Police Review Board of Pittsburgh v. Murphy*, 819 A.2d 1216, 1222 (Pa.Cmwlth.2003) (quotation omitted). Moreover, declaratory "relief cannot be used in anticipation of events *that may never occur* or for rendering an advisory opinion that may prove to be purely academic; there must be a real controversy." *Id.* (emphasis added); *see also Mazur*, 954 A.2d at 53 (holding that declaratory relief "must not be employed to determine rights in anticipation of events that may never occur . . .").

Neither the Governor nor DCNR[1] have made a decision regarding whether to lease additional state lands; consequently, there can be no actual challenge to a decision that has not yet been made. Moreover, there presently is not a disagreement between the Governor and DCNR over leasing. Therefore, a real controversy does not exist and declaratory relief "must not be employed in anticipation of events [such as a dispute over leasing] that may never occur." *Murphy*, 819 A.2d at 1222. Therefore, to the extent that the Majority addresses this non-existent controversy, Part IV(E) of the opinion is dicta.

I also believe that the Majority's decision is problematic given that it is based entirely on contingency. Without an actual controversy there is a lack of facts to which the law can be applied, thus, making it difficult to determine the parameters of the Governor and DCNR's decision-making authority vis-à-vis oil and natural gas leasing. This is especially true given the ambiguities in the Conservation and Natural Resources Act[2] (CNRA) concerning the authority for oil and natural gas leasing decisions. Moreover, the problematic nature of resolving an issue without a controversy or facts is exacerbated by the unclear basis for the Majority's decision.[3] I, therefore, differ materially with the Majority's approach of injecting this Court into a potential future disagreement between other government officials that may never materialize.

---

1. The Majority does not specify who within DCNR, e.g., the Secretary or other officials, has ultimate authority for leasing decisions. In order to be consistent with the Majority we will refer to the decision-maker as simply, "DCNR."

2. Act of June 28, 1995, P.L. 89, 71 P.S. §§ 1340.101–1340.1103.

3. While the Majority insists that its decision in Part IV(E) is grounded in the language of the CNRA, its reasoning implies that there is also a constitutional *dimension*—based on Article I, Section 27 of the Pennsylvania Constitution—to its decision. *See PEDF*, 108 A.3d at 172 (stating that in deciding to lease additional lands "DCNR is positioned to act consistent with its Article I, Section 27 duties and obligations").